Appellate, Lisa Olivero v. Frank Carrington, Appellant, Roger Boland Mr. Boland Morning. My name is Roger Boland. I represent the initial or original respondent, the appellant in this case, at this level. Mr. Carrington was represented at the trial court level by the firm of May May, Angel, and Harris. And I was asked to take this matter up before this tribunal. Now this appeal involves a divorce case. It's not one of the normal thousands of cases that are reported about divorce that we can read about in the reporters. This is anything but a routine disagreement about asset allocation. I think this case provides the court with the opportunity to review the propriety of the trial court's characterization of residential real estate as a marital asset. Now in this case, Brian Carrington purchased a house approximately four years before he married Jill. Nevertheless, the trial court found that the purchase was in contemplation of marriage, thereby allowing the court to characterize the asset as marital. And the court awarded 100% of the interest in that asset to Jill. As a consequence of that allocation, the overall division of the assets by the trial court was 80% to Jill and 20% to Brian. Now in this case, I submit to you, there are three dates that are significant. Is that the general relationship of the properties? The house is 80% of all the properties? No, the house is not 80% of the overall. The house represents something approximating 50% of the total. So it's by far the largest asset. The three dates I would submit to the court are October of 2001, that's when Brian bought the house. December of 2004, that's when Brian and Jill were engaged to be married, some three years and two months later. And the third and final date is July of 2005, that's when they were married. So just under four years between the purchase of the house and the marriage. Now, since it is Jill who purchased a marital asset, notwithstanding its acquisition prior to the marriage, she must carry the burden of proof on the proposition that it was purchased in contemplation of marriage and therefore a marital asset. I submit to you that her case, when boiled to its essentials, is a theory in search of facts. In determining whether she has carried that burden, we've got to evaluate the what and the when of the case. Well, the when is the time of the acquisition of the house, that is October of 2001. I mention that because in the brief filed by the appellee here, counsel spends a great deal of time talking about activities which occurred after the house was acquired. That's not pertinent to the analysis. Now the what, that's represented by a core group of factors that have been referred to for 30 some years by our courts of review. The first, and I think the most important factor, is the proximity in time between the purchase of the asset and the marriage. Second factor is the source of the funds used to buy the house. Third, who and I repeat none of the evidence in this case supports the court's finding on those core group of factors. What's the proximity? Four years, roughly four years. There is no reported case in Illinois that supports the proposition that an asset acquired nearly four years before the marriage is acquired in contemplation of marriage. It simply doesn't exist. In fact, that's more than double the time permitted by any court. Let me ask you, when you were listing facts that you thought were important, you left one out that I know your opponent thinks is important, and that is the birth of the child. What say you about that? Well, I don't think the birth of the child ought to play a role in the equation. In fact, there is no case reported that includes that as a factor, and you've kind of anticipated where I was heading with this on the policy issues, and allow me to address those then. I think the tipping point in this case was the fact that the parties cohabited together prior to the purchase, and then up through the time of their marriage, and ultimately their had a child born out of wedlock. That, when you look at the core factors, none of those core factors support the conclusion the trial court reached. When you add in the fact that, I'm sorry? How many children out of wedlock? One. Well, how many children? Three. By the time of the dissolution action, there were three children. Actually, the wife was pregnant. When was the second? I believe the second child came along in 2007. But to get to Mr. Justice Schmidt's point, if you add those factors, the cohabitation and the child born out of wedlock, and please understand, I'm not making any sort of personal characterization of either of these people. The fact of the matter is, I know both families personally, so I'm not making any personal characterization. I'm making a statement of fact here. Relying on those factors is bad policy. It's bad policy because it subverts the public policy underlying the Marriage and Dissolution of Marriage Act. That policy is to support and sanctify the institution of marriage. These people weren't married. Well, I understand where you're going, but for some reason you're saying there's a bright line two-year limit, right? You can't contemplate marriage any longer away than two years. Well, no, I'm not exactly saying that. There's no case that says two years and you're out. I'm just saying that as a practical matter, there are no cases which have concluded that an asset acquired more than 15 or 18 months was acquired in contemplation of marriage. And there are some other reasons for that. Well, but what is the evidence in this case? I mean, was there testimony presented that there was over a four-year period of time contemplation of marriage? No, I submit to you there were. Now, counsel is going to tell you that there were some discussions between the parties about possibly getting married in the future. Now, in that regard, I've quoted the Leisner case where the court noted that it's not unusual or uncommon or unexpected that people who are living together may talk about getting married at some point in the future. Now, if that's what we want the legislation to be, let's say so. I don't think it is. Well, not legislation. I'm sorry? You said the legislation? Yes, the legislation today is that assets judicially the concept of assets acquired in contemplation of marriage. Now, if we're going to add to that cohabitation or children born to the parties out of wedlock, then let us have the intellectual integrity to say that's what the standard ought to be. Assets acquired before the talked in general terms about getting married are marital assets. Now, in terms of their conversation, Jill testified that they talked about getting married at some point. So there was, back to my original question, there was some discussion, but understand this. Here's the evidence. The evidence is from Jill, not from Brian. Jill's testimony was that they had talked about possibly getting testimony that she talked about it, she mentioned. He didn't deny that. However, there was no specific plan. And keep one other thing in mind. What was her testimony about? She said they talked about or she mentioned about having a church wedding, who might be in the wedding, the attendance, etc. Now, what happened? Is that consistent with the reality? No, they didn't have a church wedding. They went off to Las Vegas at a time to correspond with a Girl Scout troop trip planned by Brian's parents, or his mother. So even taking the testimony in a light most favorable to her, what she talked about after the pregnancy became known isn't what happened. And I would refer again to the Leissner case, where that court noted, and I'm quoting, at most the evidence shows that at the time the residence was purchased, Karen, the lady in that case, Karen planned to eventually marry. It fails to show that Anthony had similar plans. That is an analogous situation to our case. And what is in Leissner, it was insufficient to sustain her burden of proof. In Leissner, the trial court... What you're saying, in effect, is that the rule, the decision should be, the law should be, that both parties must be discussing it or to be in contemplation of marriage. I think that's a fair characterization. In the Leissner case, her own subjective thoughts and the fact that she said what she said wasn't enough. And as I was saying, in Leissner, the trial court held that the asset was marital. That ruling was reversed. In other words, the appellate court, the First District, held that notwithstanding her testimony, it didn't meet her burden, and the evidence, the ruling by the trial court was inconsistent with a manifest way to the evidence. We have two issues. Assuming the trial court finds one party to be criminal, which was the wife in this case, it largely relies then on what she says, they thought, or he said. Well, there has to be, I says now, the spouse that's trying to make a marital property says, we talked about it, he and I agreed that we're going to get married. The trial judge says that's credible testimony, his testimony, but the contrary, I don't buy it. Is that what we're asking? I'm saying that the Leissner case indicates that's insufficient, and that's why it's important to fall back on or keep in mind these core group of factors. How was title taken? In this case, Brian took title. How, or where did the money come from? Was it a joint effort or not? In this case, Brian came up with the down payment. Who signed the offer sheet? In this case, Brian signed the offer sheet. So when you look at the core group of objective factors, they all favor a determination that this property was not acquired in contemplation of the marriage, and it should have been characterized by the trial court as non-marital. And if you want to dovetail testimony, obviously the trial court's entitled to consider that. I'm saying when you look at the core group of factors that all courts seem to rely upon, and then you incorporate testimony, if it's only one side talking in generalities, it's insufficient to carry the day. And as the same court... Just a second. Justice Litton's suggestion in the case you cited sounded a little bit different to me. In the case you said the woman testified that she was contemplating getting married, there was no testimony from the husband, and apparently no testimony from her that he previously said at the time he bought the house that we were going to get married. So in other words, she testifies that he said he was contemplating marriage at the time he bought the house. Does that make this different from the case you cite? No. I think the evidence was that Jill testified that there were comments or discussions. Now, you and I might meet on the street and talk about a subject matter. We had a discussion. When we talk about having a discussion, it doesn't necessarily mean that Brian, in this case, acquiesced in that testimony. He disputes her assertions other than, yes, they had discussions or she made comments about wanting at some point to get married. Now, keep in mind, her testimony is at about the time of the pregnancy and there were general discussions later. But there's another factor. Remember that second date I mentioned? That second date is December of 2004, three years plus after the house was acquired. What happened then? They got engaged. Their status changed, to borrow a I'll tell you what changed in October of 2001, when Brian bought the house shortly thereafter, their address changed. Their marital status didn't change. It changed when they got married and in December of 2004, she got a ring and a date, three years after the house was purchased. And so when you take all of this together, you have some vague generalities by the wife. And that's it. So really what you're saying is to hold as a trial court is, we're really back doing a common law marriage. That's exactly what I'm saying. And I thought that went out in June of 1905. And we also subvert, in my view, the ruling of the Illinois Supreme Court in the Hewitt case. Now, some may say that's passe. It was late 70s. We've gone way past that. I don't think so. There are a lot of reasons why we ought to follow the lessons in the Hewitt case. But the determination by the trial court seems to me to be inconsistent with the public policies outlined by Hewitt, by the common law marriage prohibition, and it undermines the fundamental basis for the Illinois Marriage and Dissolution of Marriage Act to the extent that statute wants to promote the sanctity of marriage. Counsel's time. Thank you, Mr. Boland. Ms. Oliveira. Good morning, Congress. Good morning, Clerk. What I'd like to do is address the arguments that Mr. Boland made because I can tell by the way of his passionate arguments that he's arguing the facts in this case. And he's missing 99.9% of all the facts when he makes his argument. Because, for example, he says all they did was talk about getting married. This court, in a very detailed opinion, told the facts to show that they didn't just talk about it. They planned to get married. They prepared their home for their marriage. And, for example, when Brian purchased the home, immediately after he purchased the home, all of the utilities were put in Jill's name. She made all of the utility payments on the home. She did the majority of the remodeling to the home. And this is before they were married. She and her family, as well as Brian and his family, also put in a lot of money into that home before they were married. You cannot ignore those facts. Because if you ignore those facts, you are in essence ignoring the Well, another line of analysis says that it's still his property, but they make contributions and that they're going to get reimbursed. But in my opinion, that is what I consider a disingenuous statement by Mr. Boland to say it was his property, or to say he purchased it. Legal title went into his name, but he took a mortgage for a small amount. I'm sorry, he took a mortgage and made a down payment for a small amount. He made the mortgage payments, which were only $369 a month. She made the utility payments and helped with the real estate taxes and the insurance payments. So when you look at the amount of money that she put into the house versus what he did, this is prior to the marriage. They get married. And then, which is also critical in the case, and this is when I said they missed 90% of the facts, when Brian left the home, he voluntarily left the home before Jill filed for divorce. He left this house that he is now claiming is his non-marital house, and he gave her the mortgage payment for it and said, you pay the mortgage. He didn't file for divorce. Jill filed. So from the time he left until now, Jill alone has been making the mortgage payments, the real estate tax payments, all the other payments in connection with the house. Well, that may not convert it to marital, might it? Or I mean, can it remain non-marital and in the property distribution account made for all of these contributions to a marital estate? Yes, it could. But what those facts show is it was not his intent that that house be a non-marital home. It was his intent, as his court found out through the facts. He intended from day one that they were going to get married. She, Jill, should not be punished because it took him three years to formally give her a ring and get married, which is what is going to happen here. And that's why the cases say you have to look at the totality of the circumstances. You have to look at all of the facts. And if you saw in the briefs, Mr. Boland's statement of facts was two or three pages. Mine was longer, not because I felt it would persuade you. I felt you needed to know all the facts. And Mr. Boland argues that I brought in facts after the house was purchased. Again, those facts show that, indeed, Brian intended to marry her. There was no doubt that he intended to marry her. I even found, during the argument, the portion of the I'm sorry, why he did not put Jill's name on the title to the house. And his answer was, well, I was the one that could financially afford it. And the lawyer asked again, another follow-up, and he says, well, I was the one that paid for the house. He was given every opportunity to say, I didn't intend to marry her. That's why I didn't put her name on the house. He was given every opportunity in this lengthy trial to explain that he did not intend to marry her, and he did not. He kept bringing up financial issues. And again, in my opinion, when he borrowed the money, and then marital monies, as this court explained, and I'm sure you read in the facts, marital monies built up the And for him to come in here on a brief and say to you, you're taking away this house that this man had prior to the marriage and giving it to her. The deed was in his name, but the equity was built up with marital Five years. And how long was the house in Brian's name? The house was in Brian's name from 2001 until 2005. I'm sorry, the house is still in Brian's name. Right. So roughly half the time they were married, or not married, half the time, it was Brian's, in other words, you're saying that it was all built up during the marriage. There's only five years of marriage out of it. During the marriage, Brian increased the mortgage on the home. He refinanced the home. And he increased the mortgage from, I believe, $61,000 to $65,000 to pay off a credit card debt that he had prior to the marriage. So right now, when the judge gave the house to Jill, she took it subject to the mortgage. And there's a substantial mortgage on the house. Let me ask you about this time issue. All the cases that have authorized this theory of contemplation of marriage are within a matter of months, maybe six months at the outside. Four years just seems like a long, long wait. Can you respond to that? Sure, sure, I can. I can. Not in terms of facts, but in terms of the cases. I think in terms of the cases, it's because they were older cases and no one had the facts that we have in this particular case to show that, as is true with many young couples nowadays, and that they have children out of wedlock and they purchase an asset, that these two were planning to get married and it just got stalled. And I know I'm probably arguing the facts. Yeah, I probably did argue the facts more than the law. And I also want to state that the court in its ruling did a very good job of showing the credibility issues that it ruled upon in relation to Brian's testimony and Jill's. For example, when counsel says 80% of the assets went to Jill and only 20% went to Brian, that, in my opinion, is an inaccurate representation as it relates to the house issue because there were other issues. There was dissipation. Well, let's focus on this because it seems like this case, we can take notice that couples are cohabiting. It seems to be a standard in some areas. And yet we do not have common law marriage, we do not have telephony. Now we have four years of cohabiting and having children. And this doctrine of incontemplation of marriage seems to be kind of establishing it. Common law, talimony, relationships, doesn't it? No, it doesn't because they got married. These two got married. Uh-huh. You think so just as soon as you get married that converts everything non-marital to marital? No, no. And this was a house. So the incontemplation... So it depends on the asset. No, it depends on the asset and how you use it. If you look at the analysis that the court made, which is the same analysis that I made in my brief that I filed with the court, all the facts lined up. They had a house. Brian and Jill lived with Brian and Jill's parents. I mean Jill's parents. Brian and Jill lived with Jill's parents. They were able to save the money to buy this house. Everything shows that it was a joint effort. So what, I guess, how about a car? Sure. A car too? Would that work? Well, the only other case that I found was a bedroom set. I think I cited that in my, where a bedroom set was found to be purchased in contemplation of marriage. I honestly... You see the problem. Yeah, I see the problem, but I don't think the case is intended perhaps... So really it's going to come down to, to avoid that, what does the evidence in the testimony say as to whether there is contemplation of marriage? And what does this record say in regard to her testimony and his? This record is voluminous. I took so much time to put that in the statement of facts. They talked about it. They talked about the details of getting married. Again, imagine a house being purchased... But we knew it was going to happen, whatever, all of that stuff. And then what are we going to get from him? In answer to the first question, absolutely. Okay, how about the second question? And he never really denied it. That's the issue in this whole, he never really denied it. He tried to dance around it, but never really denied it in the hearing. Was the question ever put forth by opposing counsel to him? I believe she said, did you intend to marry? And he said no. But to say, as we all know, to say what you intended, and then you look at your actions. And again, when she said, why didn't you put Jill's name on the deed? Well, again, he had every opportunity to say, she was not going to be my wife. I didn't intend to marry her. We were just going to live together. His answers were not that. His answers were, I paid for the house. Well, no, he didn't pay for the house. He took the mortgage out, and they both contributed to the expenses for the purchase of the house. Well, let me just ask you a plan B question, and that is, had the trial judge said, okay, this is his premarital asset, he still could have put your client in the same financial position as if he had found that a marital asset, couldn't he? I mean, there's more than one way to skin a cat. He can readjust allocation of other assets and money owing and order him to pay money back for her investment into his asset. Sure, he could have done that, but this is the house where she and the children lived and that Brian intended for them to live. And again, the judge, in his written opinion, didn't necessarily focus on this as a reason, as well as all the other reasons, but I felt this was critical. Again, Brian left this house, this house that everyone, and the big argument by Mr. Boland is it was his house. He left his house. He did not, in financial filings with the court, two of them I put in the facts, he did not at any time say this is my nonmarital asset, I want this house. I put into evidence to show intent, because it's to Brian's advantage now to say, no, I didn't intend that to be a marital asset. I put into evidence a letter that he wrote to Jill to show intent when they were trying to discuss who would get what. He didn't want the house. It was only after he started realizing that he wasn't getting his way on other issues that he then said, you know, this is a nonmarital asset. And I'm not saying that that takes away from the legal characterization of the asset. But what was tremendous about this case was all of the facts show that he never intended this asset to be anything other than their house. I put in a lot of testimony that Brian kept calling it our house. This is our house. This is what Jill, I remember cross-examining Brian and saying this is not a painting that you put on the wall and just look at it and make payments on it, you have to maintain the house. Jill did that. Jill did all of that. And they planned to be in that house as a family unit. When he purchased the house, it was a three-bedroom house, they had one child. There's absolutely, there is zero evidence that they purchased it to cohabit, to have a common-law marriage. There's no evidence of that. They purchased, talked about, intended to marry. And the record is so voluminous because it is so easy for anyone. We do this as trial lawyers. Of course I knew he was going to get up there and say I didn't intend to marry her. Of course I knew that. So knowing he's going to say that, you put in all the facts to show no, that's not true. Your actions speak louder than your words. So we will find his testimony that he did not intend to marry her? I believe that was asked of him where he said I did not intend to. I believe that that question was in there. Thank you. Thank you, Ms. Oliveiro. Mr. Boland, some rebuttal? Before you get started, let me ask you a question. On the basis of the question I asked Ms. Oliveiro, and that is, should you prevail here and wouldn't we have to send it back because wasn't that house part of the whole distribution? In other words, he gets to redistribute property, the trial judge does, and can't you win a battle and lose a war? That's a possibility. I agree with you entirely that if this court sees fit to reverse as the characterization of this asset, it would, in my view, be compelled to remand because you're going to refigure the asset allocation. And when this court determines that this asset is non-marital, the factors in the Marriage and Dissolution of Marriage Act compel the trial court to divide the remaining marital assets, taking into account the non-marital assets that would be set aside for one or the other. That also apply to maintenance. Well, that's an issue in the case then if it's remanded, it certainly is. And with regard to contribution, if the wife takes the position that she ought to be reimbursed for contribution toward his non-marital estate, it's a jump ball. I agree with that entirely. Now, one thing that impressed me with regard to counsel's argument with regard to the trial court's analysis, when you go through this core group of factors, did either the trial court or counsel say that the analysis of factor one favors Jill? Analysis of factor two favors Jill, or number three or four? No, they didn't say that. What they did say, and in counsel's brief indicated when you look at, for example, the proximity issue, they took the position that, viewed alone, that factor doesn't preclude the court from concluding the asset was acquired in contemplation of marriage. With regard to the source of the funds, that was Brian. He put the down payment down, Jill didn't. The statement was made, that factor alone does not preclude the court from finding that it was in contemplation of marriage. With regard to who signed the offer sheet, again, that was Brian, not Jill. Jill wasn't involved in the closing, she wasn't there, her financial information wasn't provided to the lender, none of that. She was uninvolved in the business of acquiring this asset. Nevertheless, counsel and the court said, that factor alone does not preclude the court's conclusion. That's how they went down the list. Each one individual, doesn't preclude, doesn't preclude. Nobody has said that the factors that are identified by the courts of review in this state support the decision of the trial court. That ought to be our focus. Where in all of this massive record is there an indication that as to these core factors, the evidence supports the court's conclusion? The answer is, it doesn't. That's why I think the fact that they cohabited and the fact that they had a child is the tipping point. Now, we all sit up here and we say, we shouldn't promote children born out of wedlock. There are all kinds of problems in our culture and our society as a result of that. We shouldn't promote cohabitation. Do you think if we affirm the trial court, it's going to cause people to run out and have kids out of wedlock? No, I'm not saying that. But the question is, is that the policy this court or any court ought to promote? And I submit to you that the answer to that is no. But the real rub here is that we pontificate policy, but we don't like the consequences or the complications those policies bring. Well, this is one of those situations. When this house was bought, Brian bought it, Jill didn't. When they had a child, the child wasn't the product of parties that were married. Those factors have brought complications. Now, that's why I say, if we're going to incorporate those factors, then let's say so. Let's have the intellectual integrity to say that factor, the child born out of wedlock or the cohabitation, ought to count in the mix. If this court does that, you will be the first. It's my belief that the core factors— Has any court addressed that issue and refused to consider the factor? Not from the opinions that you read. In other words, there's no rejection, no formal or stated rejection of that. But the absence of that would be consistent with the public policy. But what the courts have done is develop a list of objective factors. That's right. I mean, why would a court, why would we want to pontificate about anything if we've got certain factors that the court's common law has developed? Ms. Oliveira said that I have a short statement of facts, and I am trying to persuade you, and I think you have four or five factors that have been relied upon since 1979 that give you plenty of authority for the proposition that this trial court has gone too far. It's an unprecedented expansion or extension of this concept. And I think that creates all kinds of problems, and I think we are well advised to follow our precedent. Okay, Mr. Bowen, thank you. Ms. Oliveira, thank you both for your arguments here this morning. This matter will be taken under advisement, a written disposition will be issued, and right now the court will be in a brief recess for a moment.